COASTAL STATES MARKETING,
INC., Plaintiff,

v.

NEW ENGLAND PETROLEUM,
CORPORATION, Defendant.

No. 76 Civ. 796 (HFW).

United States District Court,
S. D. New York.

April 4, 1979.

Shea, Gould, Climenko & Casey, New York City, for plaintiff; Michael Lesch, Arthur D. Felsenfeld, New York City, of counsel.

Eaton, Van Winkle, Greenspoon & Grutman, New York City, for defendant; Samuel N. Greenspoon, Gary A. Woodfield, New York City, of counsel.

MEMORANDUM DECISION

WERKER, District Judge.

This action was commenced by the plaintiff Coastal States Marketing, Inc. ("Coastal") against the defendant New England Petroleum Corp. ("Nepco") to recover sums allegedly due under a modified contract for the sale of low sulphur fuel oil. A nonjury trial was held before the Court in May 1978 and Nepco was found liable to Coastal for $192,936.06 with interest, costs and disbursements. Judgment was entered for Coastal on May 30, 1978.[1] This matter is presently before the Court on Nepco's motion for leave to reopen discovery and to

---

1. Judgment was entered against Nepco for $237,890.16, with costs and disbursements.

amend the pleadings and pretrial order, for permission to present additional evidence, and for an order vacating the judgment herein.

## BACKGROUND

Coastal is a Texas corporation with its principal place of business in Houston, Texas. Nepco is incorporated in New York and has its principal place of business in New York, New York.

This action arose from a written agreement entered into by the parties on February 5, 1974 and subsequently modified on March 15, 1974 providing for the sale of low sulphur fuel oil. Pursuant to the modified agreement, Coastal was to deliver 40,000 metric tons of oil to Nepco's vessel F.O.B. a main Caribbean port at $12.70 a barrel. On March 26, 1974, Coastal delivered 31,952 barrels of oil, which it had purchased from Compania Shell de Venezuela ("CSV"), to Nepco's vessel at Punta Cardon, Venezuela. On June 27, 1974, Coastal requested payment of $405,790.40 from Nepco to cover the purchase of the oil, and on July 25, 1974, Nepco directed its bank to transfer $212,854.34 from its account to Coastal's account at the same bank. Nepco withheld the balance of $192,936.06 on the ground that this amount was due and owing from Union Western Trading Corp., a "sister company" of Coastal. Nepco contended that Coastal had consented to this deduction from the purchase price of its March 26th delivery of the 31,952 barrels of oil.

Coastal commenced this action in February 1976 to recover the unpaid balance of $192,936.06 from Nepco, with interest, costs and disbursements. Discovery was completed, a pretrial order was filed, and the case was designated ready for trial on August 12, 1977. In March 1978, some seven months later, Nepco made a request, followed by a formal motion, for leave to reopen discovery on the issue of illegality.

Nepco sought additional discovery to obtain information which it claimed would establish that Coastal had illegally overcharged Nepco in the transaction which formed the basis of this action. The motion was denied on May 15, 1978.

Following the trial and entry of judgment for Coastal, Nepco filed an appeal with the Court of Appeals for the Second Circuit, raising as the sole issue the propriety of this Court's denial of its motion for additional discovery. On October 17, 1978, after the appellate briefs had been filed but prior to oral argument, Nepco submitted a letter to the Court of Appeals stating that the Department of Energy (the "DOE") had issued a Proposed Remedial Order ("PRO") to Coastal States Gas Corporation, the plaintiff's parent corporation, and stating further that the House of Representatives Subcommittee on Oversight and Investigation, Committee on Interstate and Foreign Commerce, had conducted public hearings on the legality of a number of oil transactions entered into by Coastal and its parent in 1973 and 1974. Coastal filed a letter responding to Nepco's letter on October 26, 1978.

On October 31, 1978, the Court of Appeals issued an order remanding the action to this Court. The remand order directed Nepco to bring to my attention the matters referred to in the October 17th letter and granted Nepco permission to make the instant motion. After having reviewed the letter as well as all of the materials submitted in connection with this motion, I am of the opinion that Nepco's motion must be denied in all respects.

## DISCUSSION

The price regulations of the Federal Energy Administration (the "FEA")[2] apply to "each sale or purchase of a covered product in the United States except as provided in

---

2. The FEA is one of the predecessor agencies of the DOE. The DOE was created in 1977 pursuant to the Department of Energy Organization Act, 42 U.S.C. § 7101 et seq. Section 301 of the Act, 42 U.S.C. § 7151, transferred to the DOE all of the functions which had previously been vested in the FEA.

Subpart C." 10 C.F.R. § 212.2.[3] One of the exemptions provided by Subpart C is the "prices charged for imports, but only the first sale into U.S. commerce . . . ." 10 C.F.R. § 212.53(b). Accordingly, all transactions subsequent to the "first sale into U.S. commerce" are governed by the FEA regulations.

Nepco contends that the sale of the oil from CSV to Coastal was the first sale into U.S. commerce.[4] Consequently, Nepco alleges, its subsequent purchase of the oil from Coastal was subject to FEA regulation. Coastal argues, on the other hand, that the first sale into U.S. commerce was the transaction between it and Nepco.

The first sale exemption has been the subject of discussion in at least three agency decisions. In *A. Johnson & Co.*,[5] the FEA was faced with a situation almost identical to the one presently before the Court. In that case, A. Johnson & Co. ("Johnson"), a U.S. corporation, purchased a covered product from CSV, the same company from which Coastal purchased the oil in the instant action, and resold it to Trans Ocean Petroleum, Inc. ("Trans Ocean"), an unrelated U.S. corporation. In both transactions, the physical transfer of the oil as well as passage of title occurred in Venezuela. Trans Ocean subsequently imported the oil into the United States, reselling it to another unrelated U.S. corporation. *Johnson Appeal*, 3 FEA at 80,695–96. The FEA held that the first sale into U.S. commerce, and thus the exempted transaction, was the sale of the oil from Johnson to Trans Ocean. *Id.* at 80,699. In the instant action, Coastal

purchased oil from CSV and resold it to Nepco. Passage of title and delivery in both transactions took place in Venezuela. Nepco subsequently imported the oil into the United States. The transaction between Coastal and Nepco thus directly correlates to the transaction between Johnson and Trans Ocean, which was held to be the exempted first sale into U.S. commerce.

Despite this direct correlation, Nepco argues that the *Johnson Appeal* is supportive of its position. Nepco points to the broad language in that case concluding that:

> If a firm that is domiciled in the United States purchases an allocated product outside the United States a rebuttable presumption will be established that the firm is purchasing the goods for importation into the United States.

*Johnson Appeal*, 3 FEA at 80,698.[6] Nepco contends that since Coastal is domiciled in the United States, it must be presumed that its purchase of the oil from CSV was intended for importation into the United States. Since Coastal has not presented any evidence to rebut this presumption, Nepco argues, the first sale into U.S. commerce was the transaction between Coastal and CSV. Nepco is supported in this respect by the PRO issued by an enforcement official of the DOE, which concludes that "Coastal's subject sales were subsequent to the first sale into U.S. commerce and not exempted by 10 C.F.R. § 212.53 . . . ." PRO at 32.[7] Indeed, the claims asserted by Coastal herein in opposing this motion were rejected by the DOE enforcement official who issued the PRO. Nevertheless, the

**3.** The Mandatory Petroleum Price Regulations, 10 C.F.R. § 212.1 *et seq.*, were promulgated by the FEA pursuant to the authority granted by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.*

**4.** It is undisputed that the fuel oil involved herein was a "covered product" within the meaning of 10 C.F.R. 212.2.

**5.** 42 Fed.Reg. 23739 (1975) (Interpretation No. 1975–24 of the FEA General Counsel), *modi-*

*fied*, 3 FEA ¶ 80,546 (1976) (Decision and Order on Appeal). Hereinafter, these two decisions will be cited respectively as the *Johnson Interpretation* and the *Johnson Appeal*.

**6.** When the quoted sentence is placed in context, it is clear the FEA was discussing a U.S. firm which imported a product into the United States after purchasing the product abroad. *See* 3 FEA at 80,698.

**7.** A copy of the PRO is annexed to the affidavit of Gary A. Woodfield, sworn to Nov. 10, 1978, as part of exhibit D.

**134**

Court is compelled to reject Nepco's contentions and to disagree with the proposed legal conclusions set forth in the PRO.

Nepco's position is that *any* sale of a covered product to a U.S. domiciled company is presumed to be the first sale into U.S. commerce. *Accord,* PRO at 32. This overly broad proposition is untenable, however, and conflicts with both *Johnson* decisions.

The *Johnson Interpretation* made it clear that the presumption of intent to import into the United States applies to the company actually importing a covered product:

> [T]he FEA has concluded that the first sale into U.S. commerce is the transaction *pursuant to which* the product in question is *actually imported* into the United States. A factual determination must be made in each case as to which of several transactions was the one 'pursuant to which' importation in fact occurred. This question can usually be resolved by considering the *domicile of the importer* (i. e., the entity that has title to the product at the time it physically enters the U.S.) and its normal business practices. Thus, as a general rule, if the importer is a foreign corporation, the first sale into U.S. commerce is the first sale to a customer within the United States. However, if the importer is a U.S. company which purchases the product abroad for the purpose of importing it into the United States, the *FEA will consider the first sale into U.S. commerce to be the sale to such importer,* even though it may occur abroad. Furthermore, the FEA will presume that a U.S. firm which purchases a product abroad *and subsequently imports it* made the purchase for the purpose of importation.

*Johnson Interpretation,* 42 Fed.Reg. at 23739 (emphasis added).[8] This construction of 10 C.F.R. § 212.53(b) was left undisturbed on appeal. The *Johnson Appeal* modified the *Interpretation* only to the extent that it determined that additional factors were to be considered in rebutting the presumption established by the *Interpretation. Compare Johnson Appeal,* 3 FEA at 80,698, *with Johnson Interpretation,* 42 Fed. Reg. at 23739. Moreover, the *Johnson Appeal* unequivocally states that "the last sale of the goods prior to their arrival in an American port will generally be the 'first sale into U.S. commerce' as that term is used in 10 C.F.R. 212.53(b)." 3 FEA at 80,698.

Any doubt as to the applicability of the presumption is dispelled by examining the result in *Johnson.* The *Interpretation* applied the presumption to Trans Ocean, the importer of the covered product. This was affirmed on appeal. 3 FEA at 80,699. If Nepco is correct in arguing that the presumption applies to *any* purchase of a covered product by a U.S. domiciled company, the FEA in *Johnson* would have applied the presumption to Johnson, which it did not do. *See also Quincy Oil, Inc.,* No. FRA–1428, slip op. at 14–16 (DOE Jan. 17, 1979) (Decision & Order) and *B&D Oil Co.,* 5 FEA ¶ 80,652, at 81,299 (1977) (Decision & Order), where the presumption of intent to import into the United States was applied to the importers.

■ It is clear, therefore, that the presumption applies to a U.S. company which purchases a product outside the United States and imports it into the United States. Unless the presumption is rebutted, the exempted first sale in such an instance is the transaction whereby the importer purchased the product, *i. e.,* "the last sale of the goods prior to their arrival in the American port . . . ." *Johnson Appeal,* 3 FEA at 80,698. If the U.S. importer is able to rebut the presumption, the exempted first sale into U.S. commerce would be the sale whereby the covered product was in fact imported into the United States.[9]

**8.** *See also* 42 Fed.Reg. at 23739 ("[T]he first sale into U.S. commerce is one that is closely related in terms of timing and function with the actual importation process.").

**9.** A hypothetical situation wherein the presumption is rebutted would perhaps clarify this matter. ABC Corp., a U.S. company, purchases a covered product in a foreign country intending to resell it to a company from another foreign country. This deal falls through, how-

The facts of the instant action, as noted above, parallel the facts of *Johnson*. The importer of the oil in this case was Nepco, and the sale immediately prior to the arrival of the oil in the United States was the transaction between it and Coastal. Accordingly, that transaction was the exempted first sale into U.S. commerce.

The Court notes that one of the objectives of the first sale exemption is the minimization of disincentives to the importation of oil and other petroleum products. *Johnson Interpretation,* 42 Fed.Reg. at 23739. The first sale exemption accomplishes this objective by exempting from FEA price regulation "that transaction which set[s] in motion the importation process . ·. . ." *Id.* The construction of section 212.53(b) urged by Nepco would undermine this objective by subjecting U.S. companies to FEA regulation immediately after they purchased oil abroad. Under such conditions, these companies would undoubtedly be encouraged to seek higher profits by engaging in uncontrolled transactions in other parts of the world.

The above conclusions should not be construed as a holding that all transactions between two U.S. companies occurring outside the United States are beyond the regulatory powers of the FEA. I find simply that the transaction between two U.S. companies immediately prior to the importation of a covered product is *exempted* from FEA regulation by virtue of 10 C.F.R. § 212.-53(b). *Compare* 10 C.F.R. § 212.2 *with* 10 C.F.R. § 212.53.

With respect to the PRO itself, several considerations persuade me to accord it little weight. First, while the PRO correctly cites and relies on the two *Johnson* decisions, it misapplies them. They simply do not stand for the proposition that the presumption of purchase for importation into the United States applies to every purchase of a covered product by a U.S. company. Second, in a section entitled "Proposed Conclusions of Law," the PRO states "that the purchases by Coastal *from U.S. companies* of products ultimately imported into the U.S. were the 'first sales into U.S. commerce' as that term is used in 10 C.F.R. § 212.53(b). The subject sales by Coastal (set forth in Attachment B) were therefore subsequent to the first sale into U.S. commerce." PRO at 40 (emphasis added). Although Coastal concedes that the transaction at issue in this action is among the 33 transactions listed in "Attachment B," it is clear that Coastal did not purchase the oil at issue herein from a U.S. company. Thus, despite the inclusion of the instant transaction in "Attachment B," it may very well be outside the intended scope of the PRO. Finally, the PRO is not a conclusive or binding agency determination, but is merely in the nature of an "administrative complaint" which the enforcement branch of the DOE uses to commence an adversarial proceeding before the Office of Hearings and Appeals, the adjudicatory branch of the DOE. *See Pawnee Petroleum Co.,* 2 DOE ¶ 83,001, at 86,001–02 (1978) (Decision & Order); *see also* 43 Fed.Reg. 3995 (Jan. 31, 1978).

The fact that a congressional hearing was held on the legality of some of Coastal's past fuel oil transactions has equally little bearing on the issues raised in this action.

ever, and ABC Corp. imports the product into the United States by selling it to XYZ Corp., an unrelated U.S. corporation, with passage of title and delivery in the United States. The issue posed is whether the first transaction whereby ABC purchased the product or the second transaction wherein ABC sold the product to XYZ is the first sale into U.S. commerce. As a U.S. domiciled company which imported a covered product, it would be presumed that ABC purchased the product with the intent to import it into the United States. This presumption is rebutted, however, by evidence of the unconsummated deal with the second foreign company and evidence of ABC's past operating history. Under these facts, the first sale into U.S. commerce would have to have been the transaction between ABC and XYZ. This situation is akin to the situation where a foreign corporation buys oil from another foreign corporation and then imports it into the United States by reselling it to a U.S. purchaser. Since no presumption applies, the resale to the U.S. purchaser would be the first sale into U.S. commerce. In our hypothetical situation, had the presumption not been rebutted, the first sale into U.S. commerce would·have been the transaction whereby ABC purchased the product which it subsequently imported. *See generally Johnson Appeal,* 3 FEA at 80,698–99.

**136**

By Nepco's own description, the hearing was concerned with "unusually large and unnecessary payments [made by Coastal] to foreign 'entities' as well as apparently needless transfers of the title to such oil through various bogus corporations which enabled Coastal to grossly inflate the price of oil while, at the same time, evidencing only small profits on their books for such transactions." Affid. of Gary A. Woodfield, sworn to Nov. 10, 1978, at ¶ 23. More specifically, these alleged paper transactions purportedly involved two "dummy" corporations, Fuelco and Ven-Fuel. *See* "M/T 'Independencia I'" chart annexed to exh. D of Nepco's Notice of Motion. In the instant action, there is absolutely no evidence at all that either Fuelco or Ven-Fuel was involved; no evidence has been presented to this Court indicating the involvement of any entities other than CSV, Coastal and Nepco.

To summarize, nothing in Nepco's letter of October 17, 1978 persuades this Court to deviate from its order of May 15, 1978 denying additional discovery. The transaction in the instant suit was a "first sale into U.S. commerce" within the meaning of 10 C.F.R. § 212.53(b). As such, it was exempt from the regulatory scheme of the FEA. Notwithstanding the subsequent issuance of a PRO by the DOE and notwithstanding the holding of a hearing by a House subcommittee, I see no basis for an alleged defense of illegality as to the transaction here in issue. Hence, any additional discovery would be futile.

The bounds of discovery are defined by Fed.R.Civ.P. 26(b)(1), which provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ."[10] The subject matter of the instant action is a transaction involving the sale of oil from Coastal to Nepco, oil which Coastal had purchased from CSV and sold directly to Nepco. Any material relating to any of Coastal's other transactions involving alleged "dummy" corporations or "paper" deals or other violations of FEA regulations would not be relevant to the subject matter of this action. Nepco's motion for additional discovery must therefore be denied.

## CONCLUSION

In accordance with the above, Nepco's motion is denied in all respects. The judgment entered on May 30, 1978 will not be vacated.

SO ORDERED.

---

**10.** Rule 26(b)(1) "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978). However, "discovery, like all matters of procedure, has ultimate and necessary boundaries," *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947), and "'practical considerations dictate that the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory it might conceivably become so.'" *In re Surety Association of America,* 388 F.2d 412, 414 (2d Cir. 1967), *quoting Broadway & Ninety-Sixth Street Realty Co. v. Loew's Inc.,* 21 F.R.D. 347, 352 (S.D.N.Y. 1958).